GEORGE H. HUBSCHMAN and PATRICIA L. HUBSCHMAN, Plaintiffs

v.

ANTILLES AIRBOATS, INC. and CARIBBEAN FLYING BOATS, INC., Defendants

## Civil No. 73-341

IN THE MATTER OF THE COMPLAINT OF ANTILLES AIRBOATS, INC., a Virgin Islands corporation, and CARIBBEAN FLYING BOATS, INC., a foreign corporation, for exoneration from, or limitation of, liability as lessee-charterer and owner respectively of one Grumman "Goose" Aircraft, Model G21A, Serial No. 141, Registration No. 703A, Plaintiffs

v.

GEORGE H. HUBSCHMAN and PATRICIA L. HUBSCHMAN, Defendants

## Civil No. 74-640

## District Court of the Virgin Islands

Div. of St. Thomas and St. John

## October 6, 1977

368

ISHERWOOD, COLIANNI, ALKON & BARNARD (THOMAS ALKON, ESQ., of counsel), Christiansted, St. Croix., V.I. and RIDDLE, MURPHREY, O'QUINN & CANNON (JOHN B. MURPHREY, ESQ., of counsel), Houston, Texas, *for plaintiffs*

HOWARD K. GIBBS, ESQ., St. Thomas, V.I., *for defendant Antilles Airboats, Inc.*

BIRCH, DEJONGH & FARRELLY (ALEXANDER A. FARRELLY, ESQ., of counsel), St. Thomas, V.I. and MARIA TANKENSON HODGE, ESQ., St. Thomas, V.I., *for defendant Caribbean Flying Boats, Inc.*

CHRISTIAN, *Chief Judge*

### OPINION

This is an action in Admiralty, stating claims for damages growing out of personal injuries suffered, for punitive damages, and for loss of consortium.

Plaintiff, George Hubschman, fifty years of age at the time of trial, on June 15, 1976, was then, as he now is, an attorney at law. He is presently a practicing member of the Virgin Islands Bar. Between the years 1968 and 1971, however, he earned his livelihood as a seaplane pilot, flying in the employ of defendant, Antilles Airboats, Inc. (hereinafter sometimes Antilles).

Defendant, Antilles Airboats, Inc., is a duly organized Virgin Islands Corporation. Its principal business, if not indeed its sole business, is flying passengers, mail and some freight between the islands of the United States Virgin Islands, between the islands of the United States Virgin Islands and the British Virgin Islands, and between the United States Virgin Islands and the Commonwealth of Puerto Rico. In this endeavor it utilizes chiefly aircraft manufactured by the Grumman Aerospace Corporation. The model most used in Antilles' Service is the G21A, widely known as the "goose". This is not a late model air-

craft. More accurately this twin engine amphibian would be described as a vintage seaplane, having been first manufactured going on some forty years ago. As to the equipment it flies, Antilles owns some; others it leases.

Caribbean Flying Boats, Inc. (hereinafter sometimes Caribbean), the other defendant, is likewise a corporation organized under the laws of the Virgin Islands. It was brought into being solely as a vehicle for purchasing flying boats and leasing them to Antilles. Although these two defendants in their dealings with each other have striven to keep their business transactions letter perfect, one thing cannot be gainsaid. A common element serves, to some extent, to keep them firmly bound, the one to the other; they share the expertise, guidance, services and executive direction of Captain Charles F. Blair, retired Senior Pan American World Airways Pilot, Aviator of universal renown, and founder of both corporate entities.

The particular aircraft of the Antilles' fleet with which we are here concerned is a G21A model (goose) No. N703A. All references to it hereafter will be 703A.

703A was one of two flying boats acquired by Caribbean for letting to Antilles. This goose was purchased by Caribbean on February 20, 1970. It seems that the plane was immediately turned over to Antilles and put in service. 703A was secured with the St. Thomas to Fajardo, Puerto Rico run in mind. For about two months the rental was on a month to month basis. This was formalized with a written and signed contract of lease on April 14, 1970.

On June 18, 1971, plaintiff, Hubschman, was the pilot assigned to the St. Thomas-Fajardo flight. 703A was the plane designated for that route. Sometime during the morning of that day, Hubschman made an uneventful round trip flight. Before take off, plaintiff went through the prescribed pre-flight checks. It is significant that at that time, all pilots were required to start their engines with what is

known as the cross feed valve in the "off" position. For take off and in flight, however, the standing operating procedure called for the cross feed valve to be in the "on" position. Nothing untoward was noted as the amphibian was pre-flighted and, as before indicated, a successful round trip was made. Once in the air, Hubschman noted that his "air speed indicator" was not functioning properly. Upon his return to St. Thomas, therefore, he reported this to maintenance and asked that it be rectified.

Work was done on the air speed indicator. Thereafter, plaintiff and a mechanic took the plane for a short test flight. As a result of this Hubschman, it seems, was satisfied that no serious problem was presented, even though the indicator was not functioning in "A-1" condition. The plane was then left standing on the ramp to await its next flight to Fajardo, scheduled to leave St. Thomas at 3:47 p.m.

Departure time for the 3:47 flight arrived and plaintiff boarded his aircraft with ten passengers, a capacity passenger load. Because of the length of time the plane had been on the ground, Captain Hubschman once again went through his pre-flight routine. Previous to boarding the plane he had made certain that his plane had been properly fueled, 60 gallons in the right tank, 20 in the left. Since all systems were "go" Hubschman guided the goose into the water and took off.

The flight altitude, 800 feet, was achieved. As the flight progressed, plaintiff checked his various meters, dials and gauges from time to time. All was going well, his course to Fajardo was properly set and Captain and passengers settled down for what promised to be a pleasant, scenic, but otherwise undramatic crossing. Then suddenly, ten to fifteen minutes into the flight, and without any warning whatsoever, both engines stopped dead. Hubschman immediately switched his fuel supply from his right to his left

tank. About simultaneously therewith, the plaintiff began to operate his "wobble pump".[1] He gained a restart of his engines but this lasted, at most, five seconds after which both engines quit again. Desperation now setting in, plaintiff quickly set his fuel selector to both tanks and kept his wobble pump going, all to no avail. Faced now with an apparently irrecoverable twin engine failure, Hubschman seized his microphone, put in a hurried distress (May Day) call, dropped the microphone on the floor, and went back to his wobble pump, but with no more success than before. Convinced now that a restart was not likely, by this time having lost much of his altitude, and with scant seconds to spare, Hubschman decided he had to make an open sea landing. He chose his landing spot and brought the plane down on the water.

703A was brought down a few miles northeast of the Puerto Rican Island of Culebra. It is in this area where the landing took place that the Atlantic Ocean and the Caribbean Sea come together. Because of this confluence, the waters are described as "confused seas". Other than being described as "confused" or "checker board" it does not appear that the sea on this day was in any way remarkable. The swells were described in terms of a few feet high. It is undisputed that given a structurally sound aircraft, and proper piloting, a safe and proper landing could have been effected.

As it developed in this instance, 703A broke apart somewhere in the nose area, and after remaining afloat five to ten minutes, went down to the bottom. It has never been recovered. Its pilot, the plaintiff, and eight of the ten pas-

---

[1] The fuel pumps on the G21A type craft are engine driven. The alternative method of getting fuel to the engines is by manually working, back and forth, two levers located overhead in the cockpit. These hand operated levers pump fuel to the engines. This pumping system is called the "wobble pump". Unquestionably, a properly functioning wobble pump is more than adequate to fulfil its purpose. Its pumping capacity exceeds by far the rate of fuel consumption for both engines.

sengers survived. The two passengers who were lost were last seen on the wing, or some other part of the plane. Though ordered by the Captain to jump into the water as the plane would sink with them, they, for whatever reason, did not heed the injunction.

So far, what has been narrated are findings on incontroverted evidence. The contending positions come to the fore when we come to the manner in which the plane was landed, and what caused the shearing off of the nose section, with the ultimate total loss of this goose.

Plaintiff testified that in choosing his landing site, he made an appropriate selection. He says he made a landing parallel to the swells, and with a favoring wind. Despite some skipping and bouncing after he had made contact with the water, plaintiff insists that he landed the plane properly. So much so that he thought he was "home free". Unfortunately, he claims, the left float of his plane was caught by a swell coming in from the left. This, Hubschman says, caused the plane to turn to the left, and into a wave at which latter contact the nose broke off, and he was catapulted through the aperture thus created 100 feet into the sea. Plaintiff claims that he landed the aircraft right side up and that it so remained until it sank.

Defendants lay the blame for the destruction and loss of the plane to what they consider a grave pilot error. Pointing to some unquestioned confusion in Hubschman's statement about the direction in which he had landed, confusion heightened somewhat by plaintiff's indication on a map in open court of the direction in which he had touched down the plane, they vehemently assert that Hubschman had landed the seaplane in a "suicidal" direction, right into the swells, with the result that the plane broke up, flipped over, bottom side up, and sank. In saying that the plane had flipped over on its back, defendants rely on the statements of some of the passengers who do so maintain.

For the time being, I pass over this conflict in the evidence. My findings on this point will be set out later as I discuss the question of liability.

As a proximate result of this occurrence, George Hubschman suffered severe, permanent injuries to be detailed later. A claim for Workmen's Compensation under the laws of the Virgin Islands was filed on his behalf. That claim has been long since adjudicated and paid. Over and above that, plaintiff and his wife, Patricia L. Hubschman, have brought this action seeking damages against these defendants, jointly and severally. Their complaint was filed with this Court on June 14, 1974.

These plaintiffs have laid their complaint within the framework of four causes of action. In all of them they seek the cover of the admiralty jurisdiction of this court. The first alleges wide ranging negligent acts or omissions; the second avers "un-airworthiness" and "un-seaworthiness"; the third seeks an award for maintenance and cure; and the fourth cause of action is that of the plaintiff-wife for loss of consortium.

As is said of the course of his amorous counterpart, the way of this suitor, George Hubschman, is not smooth. Not only does he have a rough road to travel, but there are pitfalls along the route, from the very first step, all of which he must gingerly step around, or his quest for damages is doomed to abject failure. And if he fails, the same fate must necessarily befall his spouse. Consequently, the discussion which follows will be pitched in terms of George Hubschman, as though he were the sole plaintiff.

First, and foremost of the thorny issues raised, is whether the admiralty jurisdiction of this court is properly invoked. In other words, do the facts pleaded and presented constitute a maritime tort.

Plaintiff must next meet the challenge as to the timeli-

ness of his suit. He suffered his injuries on June 18, 1971, it will be recalled. As noted above, it was not until June 14, 1974 that Hubschman commenced suit.

If the bar of time is surmounted, may plaintiff maintain this suit as against Antilles, his employer, having admittedly accepted the full benefits afforded an injured employee under the Virgin Islands Workmen's Compensation Statute?

Assuming safe negotiation thus far, of the road he must travel, plaintiff's climb still remains uphill. Defendants assert that if the admiralty jurisdiction has indeed attached their liability must be limited in accordance with the provisions of 46 U.S.C. section 183. Under this statute, the recovery of plaintiff could not exceed the value of the craft. Since 703A was never recovered, whatever remains of it still rests somewhere on the ocean floor. Consequently, were defendants to prevail in this contention, plaintiff would take nothing.

Other severely bothersome impediments to his travel yet remain to be met and overcome by plaintiff, if he is to succeed. Hubschman has pleaded a "Jones Act" cause of action in his complaint, but does that statute (46 U.S.C. § 688) apply to the Virgin Islands? Assuming a resolution of this question favorable to plaintiff, there is still left for determination whether in these circumstances the "goose" may be said to be a "vessel", and Hubschman a "seaman". Beyond all this, plaintiff's trial strategy, in very substantial measure, was concerned with a tort doctrine of strict liability (Rest. (Second) of Torts Sec. 402A). At the very threshold he must establish the applicability of that principle to suits in admiralty, and, going beyond that, bring within the ambit of 402A the "lessor", as distinguished from the "seller", of a chattel.

Finally, plaintiff Patricia Hubschman must face her share of difficulty for defendants resolutely contend that

there can be no recovery by a wife for loss of consortium in this district, more especially in a maritime tort.

As may be necessary and appropriate for the court's decision in this case, the foregoing issues will be addressed.

## THE ADMIRALTY JURISDICTION

The competency of this court to hear and determine matters cognizable in admiralty is unquestioned, and derives from 28 U.S.C. sec. 1333(1)[2] and 48 U.S.C. sec. 1400.[3]

Whether or not the admiralty jurisdiction of this court has been properly invoked is far and away the most vital issue on which plaintiff must prevail if his efforts are to be crowned with success.

Examination of this question must, most assuredly, begin with a consideration of Executive Jet Aviation Inc. v. City of Cleveland, 409 U.S. 249 (1972) (hereinafter sometimes Executive Jet). A brief factual résumé of that case is fitting to emphasize comparisons to be made with the fact situation in the instant case, such contrasts being necessary to the court's determination of this cause.

Involved in Executive Jet was the misfortune which overtook a land-based jet aircraft on a flight, planned to be almost entirely overland from Cleveland, Ohio to Portland, Maine, and thence to White Plains, New York. On take-off the plane flushed a flock of seagulls on, or along, the runway. The birds flew directly in the way of the plane in its ascent, while it was still over land. A sufficient number of

---

[2] "The district courts shall have original jurisdiction, exclusive of the courts of the states, of:
(1) Any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled".

[3] There is conferred upon the judicial tribunals of the Virgin Islands, jurisdiction in admiralty which shall be the same as is exercised by the United States district courts, and the practice and procedure shall be the same as in the United States district courts, and all cases coming within the admiralty jurisdiction of said tribunals shall be determined in accordance with the general admiralty laws of the United States of America.

the gulls were ingested into the jet engines to cause virtually a total loss of power. In this condition, descending toward the runway, the plane veered somewhat toward the left, and after striking one or two objects on land, ended in Lake Erie, a short distance from the shore, where it, not long thereafter, sank. Plaintiffs, owners of the aircraft, brought suit in admiralty. Holding that the cause was not cognizable in admiralty, the District Court dismissed for lack of subject matter jurisdiction. On appeal, the Circuit Court (The Sixth) affirmed. Certiorari was granted by the Supreme Court.

The High Court affirmed, holding that

. . . in the absence of legislation to the contrary, there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States.

409 U.S. at 274.

On its way to that decision the Supreme Court exhaustively and critically discussed the question, central to the lawsuit, i.e., when is a tort, particularly in the context of an aviation mishap, "maritime" and thus, within the admiralty jurisdiction of the Federal Courts? The so-called, and long standing "locality" test was flatly rejected and the strongly advocated "locality-plus" standard gained outright favorable recognition. The court, nonetheless, dropped language by the wayside from which the expansive, as well as the restrictive, readers of its opinion (the respective sides in the instant dispute) could take comfort. Thus defendants here, while arguing the lack of ". . . a significant relationship to traditional maritime activity", 409 U.S. at 268 lean heavily on such expressions of the Supreme Court as

[T]he mere fact that the alleged wrong "occurs" or "is located" on or over navigable waters—whatever that means in an aviation context—is not of itself sufficient to turn an airplane negligence

case into a "maritime tort." It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a sufficient relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.

409 U.S. at 268.

Also

The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft, whether over land or water.

409 U.S. at 270.

And further

The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship flounders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.

409 U.S. at 268–270.

For plaintiff, however, the key words are,

We need not decide today whether an aviation tort can ever, under any circumstances bear a sufficient relationship to traditional maritime activity to come within admiralty jurisdiction in the absence of legislation. It could be argued, for instance, that if a plane flying from New York to London crashed in the mid-Atlantic, there would be admiralty jurisdiction over resulting tort claims even absent a specific statute. An aircraft in that situation might be thought to bear a significant relationship to traditional maritime activity because it would be performing a function tradi-

tionally performed by waterborne vessels. Moreover, other factors might come into play in the area of international air commerce—choice-of-law problems, international law problems, problems involving multi-nation conventions and treaties, and so on.

409 U.S. at 271–72.

Whether the pre-Executive Jet confusion as to when admiralty jurisdiction attaches has markedly subsided is hard to discern. As early as The Plymouth, 3 Wall 20 (1866) the sole test, as enunciated at least, was the locality of the occurrence. However, in practice, it seems, the cases finding admiralty jurisdiction exacted a showing of something more, a maritime connection of some sort so that "locality plus" had been, ". . . sub silentio, a coordinate basis of jurisdiction".[4] The results achieved were, not unexpectedly, completely lacking in uniformity, with the situation approaching, at times, the ludicrous. So much so that one writer commenting on these cases remarked, sardonically,

They clearly establish that it is better to be a yacht in New York than a yacht owner in Maryland—better to be a water skier in Tennessee than a swimmer in New York—better to drive off a pier and be killed in Ohio than to fall from a pier and drown in Michigan. It is certainly better to slip and be injured in an airplane over the Atlantic than to slip and be injured on a launching ramp while in the Atlantic Ocean—much better to fall from the sky in a plane flying from Boston to Philadelphia and die in Boston Harbor than to drown in Lake Michigan after falling from a dock—better to fall from the sky between Florida and British West Indies and be injured than to fall from a pier in Baltimore Harbor. Finally, it is better to be run down by a surf board in Florida than to be injured by a submerged piling in the water of New York.[5]

It may well be that the post Executive Jet crop is hardly more presentable than the yield antedating that decision.

---

[4] See comment, "Admiralty Jurisdiction: Airplanes and Wrongful Death in Territorial Waters", 64 Columbia Law Review 1084.

[5] See "The Admiralty Jurisdiction Adrift", 28 University of Pittsburgh Law Review 635, 636 (1967).

Perhaps, Executive Jet notwithstanding, there is still unheeded the call for the Supreme Court to

. . . review a case and either accept the expansionist view of the admiralty jurisdiction and provide proper guidelines for the application of such jurisdiction or it should *clearly* limit the jurisdiction to traditional matters of a maritime *nature* . . . [it] *should* end the drifting of the lower courts through the admiralty jurisdiction in cases of tort (emphasis in original).[6]

In any event, a brief look at a smattering of the cases claiming Executive Jet lineage is bound to be a helpful exercise.

Higginbotham v. Mobil Oil Corp., 357 F.Supp. 1164 (W.D. La. 1973), involved the crash of a helicopter in the Gulf of Mexico. The defendant corporation had been making use of the helicopter in conjunction with extensive off shore drilling activities which it had been conducting. The District Court found as a fact that "at the time of the fatal accident [the helicopter] was performing the ordinary function of a crew boat." Id. at 1167. Thus, the Higginbotham court found the necessary maritime nexus to meet the Executive Jet requirement. In this portion of its decision the District Court was affirmed on appeal. Higginbotham v. Mobil Oil Corp., 545 F.2d 422 (5th Cir. 1977). Indeed the court on appeal went beyond the trial court finding, contrary to the District Court, that one of the plaintiffs was a seaman.

Roberts v. United States, 498 F.2d 520 (9th Cir. 1974), is another suit in which an aviation tort was found to be cognizable under maritime law. This time an airplane crashed into navigable waters some 1500 to 1900 feet short of the runway at an air base in Okinawa. Plaintiffs contended that the United States had negligently directed the landing of the aircraft and the subsequent rescue opera-

---

[6] Id. Note 5 at 642.

tions of its passengers. In reaching the conclusion that maritime law should apply, the court reasoned

According to the . . . amended complaint, the . . . aircraft was engaged in transporting cargo between Los Angeles and Viet Nam; Okinawa was merely one of a number of intermediate stopping points. Geographic realities, therefore, do not make the cargo plane's contact with navigable waters entirely "fortuitous." More significantly, the transoceanic transportation of cargo is an activity which is readily analogized with "traditional maritime activity." Indeed, before the advent of aviation, such shipping could only be performed by waterborne vessels. We therefore do not interpret Executive Jet . . . as precluding a maritime action on the facts of this case.

Id. at 524.

An unusual mishap gave rise to T. J. Falgout Boats, Inc. v. United States, 508 F.2d 855 (9th Cir. 1974). A missile released from a U.S. Navy airplane struck a ship owned by plaintiff then being operated in navigable waters off the coast of California. The airplane, incidentally, crashed and the pilot lost his life. The court framed the dispositive question in terms of whether the circumstances causing plaintiff's damages bore a significant relationship to maritime activity. In arriving at an affirmative answer, the following factors suggested by the Fifth Circuit in Kelly v. Smith, 485 F.2d 520, 525 (5th Cir. 1973), cert. denied, 416 U.S. 969 (1974), were considered:

(1) The functions and roles of the parties;

(2) The types of vehicles and instrumentalities involved;

(3) The causation and type of injury;

(4) Traditional concepts of the role of admiralty law. Examining the facts in the light of those elements, it was found that admiralty jurisdiction attached, the court saying:

Unlike the aircraft in Executive Jet, the subject aircraft is by its very nature maritime. Without question, the release of the Side-

383

winder from the naval aircraft over navigable waters created potential hazards to navigation, and the activities of the aircraft at the time were maritime in nature. The United States Navy exists, in major part, for the purpose of operating vessels and aircraft in, on, and over navigable waters. Its aviation branch is fully integrated with the naval service and, whether land-based or seabased, functions essentially to serve in sea operations . . . . Surely, it cannot be said that the naval plane's activity over water in the instant case was entirely "fortuitous" as was the plane involved in Executive Jet.

Id. at 857.

Hammill v. Olympic Airways, S.A., 398 F.Supp. 829 (D.C.D.C. 1975), arose out of the death of a Virginia resident in an airplane disaster occurring on a flight between Corfu and Athens. The airplane in which plaintiff's decedent was a passenger crashed into the waters at Voula Bay on its approach to Athens Airport within one mile of land. The court observed that

The defendant's jet liner in the instant case was engaged in what may be viewed as a Greek domestic flight, although [it] occurred almost entirely over international waters.

Id. at 834.

In deciding that the facts demonstrated a sufficient maritime "nexus" the court went on to declare:

The airplane was on a flight across the Mediterreanean Sea . . . and was serving a function that had traditionally been carried on by surface-going maritime vessels. It can, therefore, be said, and this Court so finds, that the "wrong" which befell plaintiff's decedent occurred as a result of an activity which bore a significant relationship to traditional maritime activity. That the actual crash happened to occur in Greek domestic waters, as opposed to the high seas or international waters, does not alter the fact that the rules of admiralty are uniquely appropriate for adjudicating what is in essence a maritime claim. [Citations omitted.]

Id.

A case decided earlier than any of the foregoing but com-

mented on as the "anchorman" because it brings us right home is Hark v. Antilles Airboat, Inc., 355 F.Supp 683 (D. V.I. 1973). In Hark a "goose" went down shortly after take-off en route from St. Thomas to St. Croix. On the facts of that case, the Court enunciated a finding of maritime tort,

where the plane ha[d] not fully completed the takeoff phase of its flight and been brought under control as an airborne vehicle.

Id. at 685.

In bolstering the finding that a maritime tort was established, the Court noted that seaplanes take off and land in water rather than on land; that such maneuvers are "marine" in nature and give rise to special problems warranting application of the specialized body of admiralty law; that admiralty affords special conveniences where a flight is over international waters; that it is desirable for policy reasons to treat accidents involving ships and aircraft in the same manner. Commenting that Antilles' seaplanes perform a function traditionally undertaken by waterborne vessels, i.e., transporting freight, mail and passengers between the islands, the Court found that the activity of the "goose" bore a significant relationship to traditional maritime activities thus satisfying the criteria set in Executive Jet.

On the other side of the coin, two cases may be cited, Teachey v. United States, 363 F.Supp. 1197 (M.D. Fla. 1973) and American Home Assurance Co. v. United States, 389 F.Supp. 657 (M.D. Pa. 1975). In fact, the latter case commands attention.

After having been rescued by Coast Guard helicopter from a sinking shrimp boat in the Gulf of Mexico, and after having been taken to land at Key West, Florida, by the helicopter, one Mr. Teachey, for reasons not clear to this Court, did not disembark at Key West but remained

aboard the craft when it set out for St. Petersburg, Florida. Just off the coast of St. Petersburg the helicopter crashed in navigable waters. All aboard perished. Plaintiff suing to recover for Teachey's death argued that the primary endeavor of the Coast Guard helicopter is to engage in air-sea rescue operations and that in so doing, they perform a function traditionally that of waterborne vessels. The Court rejected this argument inasmuch as at the time of the crash, as the complaint specifically alleged, the helicopter was

not in the performance of an air-sea rescue operation, but rather after the rescue had been effected. . . . [T]he mere transportation of the decedent by aircraft from one Coast Guard base to another does not constitute a sufficient act of performing a function traditionally performed by waterborne vessels so as to bring it within the dictum statement enunciated in Executive Jet, supra.

363 F.Supp. at 1199.

It is interesting to note, however, that the Court considered actual search and rescue operations as traditionally the function of waterborne craft.

The crash of an airplane while en route from Atlantic City, New Jersey to Block Island, New York, was the occasion giving rise to American Home Assurance Co. v. United States, supra. This flight, it should be noted, was from a point on land within the continental United States to an offshore island accessable only by air or sea. Unimpressed by the latter circumstance, the Court remarked:

[t]his attempted distinction seizes upon the Supreme Court's example in Executive Jet of a plane flying from New York to London which crashes in the mid-Atlantic as a *possible* instance where "traditional maritime activity" might be found. Significantly, however, this example immediately follows a sentence in which the Supreme Court reserves judgment on the question of whether an aviation tort can ever, *under any circumstances,* bear a significant relationship to traditional maritime activity so as to be cognizable in admiralty. The drift of the Executive Jet opinion is that

386

the Supreme Court has serious doubts as to whether airplane accidents are proper subjects of admiralty suits. Thus, this Court does not feel that the fact that Block Island was separated from the mainland is sufficient alone to distinguish this case from Executive Jet and support a finding that it may be brought in admiralty.

Id. at 658.

Leaning toward a limited view of admiralty jurisdiction in aviation tort cases, the Court declined to find a maritime tort in this case.

Predictably, progeny of Executive Jet appear in territories other than the aviation field, and with conflicting holdings also. The requisite maritime connection was found in a claim of improper rescue operation by land based Coast Guard where there was a drowning of a pleasure boat passenger.[7] Maritime jurisdiction was found in a pleasure boat collision as well;[8] so, too, where pleasure boaters suffered injuries as a result of shelling from land.[9] The same consideration was given where the case involved an accident during a sailing race on navigable waters;[10] likewise where a passenger bounced out of an 18 foot pleasure boat on navigable waters.[11]

On the other hand, a Court refused to find attaching maritime jurisdiction where the injury occurred as a result of a water skiing accident.[12] The same result was reached even though the collision was between two ships.[13] And where a pleasure boat capsized, resulting in

---

[7] Kelly v. United States, 531 F.2d 1144 (2d Cir. 1976).

[8] Gilmore v. Witschorek, 411 F.Supp. 491 (E.D. Ill. 1976).

[9] Szyka v. U.S. Secretary of Defense, 525 F.2d 62 (2d Cir. 1975). And see Kelly v. Smith, 485 F.2d 520 (5th Cir. 1973), cert. denied, 416 U.S. 969 (1974), where deer poachers in a boat on the Mississippi River were fired on by persons defending a private hunting preserve on an island in the same river, and admiralty jurisdiction was found.

[10] Kayfetz v. Walker, 404 F.Supp. 75 (D. Conn. 1975).

[11] St. Hilaire Moye v. Henderson, 496 F.2d 973 (8th Cir. 1974).

[12] Pfeiffer v. Weiland, 226 N.W.2d 218 (Iowa 1975). See also Webster v. Roberts, 417 F.Supp. 346 (E.D. Tenn. 1976).

[13] Fathon Expeditions, Inc. v. M/T Gavrion, 402 F.Supp. 390 (M.D. Fla. 1975).

a drowning on a dammed-up portion of the Missouri River, it was held that no maritime tort was involved.[14] A like result was reached to the same effect where a youngster, rattled by what had occurred, jumped into the Mississippi River from the flotation platform of a show boat and was drowned.[15]

Even as one superficially scratches the surface the impression is inescapable that the prayed for guidelines and uniformity of the suppliant in "The Admiralty Jurisdiction Adrift" quoted above have not materialized. Travel on the sea lanes is yet unsure. At least insofar as aviation torts are concerned, the expanding of admiralty jurisdiction is certainly a waterway through which one must "proceed with caution"[16] for as the Supreme Court has significantly warned,

[r]ules and concepts such as these [maritime] are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from navigational rules of the maritime road. The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft, whether over land or water.[17]

Our survey of the field now ended, we turn to an examination of the factual situation in the instant case in an effort to determine on which side of the line this appeal to the admiralty properly falls.

It is beyond dispute that the first half of the dual test articulated in Executive Jet has been satisfied. The locality of the alleged tort is certainly maritime. The airplane was brought down on the high seas, it broke apart thereon and plaintiff suffered his claimed injuries while he

---

[14] Adams v. Montana Power Company, 528 F.2d 437 (9th Cir. 1975).

[15] Clinton Board of Park Commissioners v. Claussen, 410 F.Supp. 320 (S.D. Iowa 1976).

[16] Victory Carriers, Inc. v. Law, 404 U.S. 202, 212 (1971).

[17] Executive Jet Aviation, 404 U.S. at 270.

was in the plane, it being on the waters and/or after he had been ejected into the water through the orifice created by the breakup of the plane. There remains only the determination of whether the alleged wrong bears "a significant relationship to traditional maritime activity", 409 U.S. at 268. In this Court's judgment, plaintiff's claim to admiralty jurisdiction is well founded and the remaining question is therefore, answered favorably to plaintiff.

In concluding that the jurisdiction of the admiralty attaches in this case, the Court is confident that it in no way adds to the asserted drift of that body of law. This case does not present "the perverse and casuistic borderline situation", 409 U.S. at 255, adverted to in the opinion on Executive Jet. Plaintiff can safely rest, and find refuge, in the holding of Hark v. Antilles Airboats, Inc., supra. I am in hearty agreement with that court. Indeed "the problems of taking off and landing a seaplane differ from those encountered with conventional aircraft"; such problems are "influenced by the 'marine' nature of the runway used"; that "where the flight is over international waters, as it was . . . here, there are *especial* conveniences in using [the] admiralty forum", 355 F.Supp. at 686 (emphasis added). I am persuaded also that the fact that the flight in question, from St. Thomas, Virgin Islands to Fajardo, Puerto Rico was to be almost entirely over international waters, is to be weighed rather heavily in the consideration of whether resort to admiralty is appropriate. Plainly the Supreme Court thought this line of reasoning of some significance as it was careful to point out the flight in Executive Jet was almost entirely over land. Certainly this "goose" was performing traditional vessel related functions. It was transporting passengers, their baggage and perhaps mail, between two points as to which access had to be either by water or by air.

All parties in this litigation in their respective written

389

summations have argued in terms of the crash of an airplane in international waters. I do not so consider it. We are not here confronted with an occurrence in which an airplane crashed, and fortuitously ended up in the open sea. Rather, we encounter an incident in which a seaplane on a flight over international waters, having taken off on navigable waters, with a like touch down planned upon arrival at its destination, suffered a total failure of both engines. The plane in our case did not fall into the sea, as did its counterpart in Executive Jet. 703A, guided by its pilot, was doing precisely what it was designed to do and was capable of doing, landing on a body of water. It was *in*, rather than *out*, of its element when the landing was made. Albeit without power, plaintiff was in the act of maneuvering his craft on the water when misfortune overtook him and his passengers. In this aspect of the case, whether the landing was letter perfect or "suicidal" is not at all relevant. The same may be said for the fact that the landing was compelled by the circumstances above mentioned. On other occasions sister ships of 703A have made forced successful, open sea landings and either navigated upon the water after power was regained, or were towed to a safe haven. As Captains Blair and Schell convincingly testified, a perfect open sea landing could have been made and would have been nothing out of the ordinary. As plaintiff related, when he realized that he would not be able to accomplish a restart of his engines in the air, he deliberately selected his landing area, guided the plane thereto and effected what he considered to be a proper landing. All of this was within the design capability of the aircraft. One has to seek far and wide to find circumstances that more forcefully point to the existence of "maritime nexus". When in fact, the plane sheared off at the nose section, putting all aboard in peril of the sea, Hubschman was not, at that point, flying an aircraft but was about to perform

the navigation function for which he was trained and which, as pointed out above, his craft was capable of executing. In point of fact, he was then virtually committed to navigation. We are dealing with a "hydro-aeroplane . . . afloat upon waters capable of navigation [thus] . . . subject to the admiralty". Reinhardt v. Newport Flying Services Corp., 232 N.Y. 115, 133 N.E. 371, 372 (1921). In the circumstances of this case there is little, if any, difference between this seaplane, broken in two while on the high seas and a ship split in half in the same setting. In both circumstances, admiralty should supply the answers to ". . . all . . . questions that may arise from such a catastrophe", 409 U.S. at 270.

The suggestion is advanced that if, indeed, there was actionable negligence in this case, such as there was might have occurred on land, and that it was only by mere fortuity that its full force and effect came to be felt while the craft was over the high seas. That argument I find wholly unpersuasive. The mere fact that land based actions, or omissions, contributed to this misfortune, does not alone preclude admiralty jurisdiction. "Executive Jet did not reject the traditional rule that where negligent act originates on land and the damage occurs on water, the cause of action is within the admiralty jurisdiction" [citation omitted]. Kelly v. United States, 531 F.2d 1144, 1146 (2d Cir. 1976). To the same effect is Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp., et al., 519 F.2d 171 (5th Cir. 1975), in which the Court concluded that the maritime nature of a tort is not necessarily adversely affected by the fact that negligent construction or defective design may have occurred ashore. Id at 174.

I conclude, therefore, that this tort occurred on the high seas and that the fulfilling of a maritime function has been amply demonstrated. There is, present in this tort, a significant relationship to traditional maritime activity.

391

## THE TIMELINESS ISSUE

The defenses of the statute of limitations and laches are affirmatively relied upon by defendants in another effort to bar plaintiff's suit. Since I have concluded that the admiralty side of this Court has been properly claimed by plaintiff, this defense will be dealt with in terms of that body of law. For this purpose, plaintiff's Jones Act claim, as well as his unseaworthiness claim, per se, will not be considered. The matter will be addressed in terms of general maritime law.[18]

■ As has been flatly stated, "[t]here is no statute of limitation in admiralty", Francis, et al. v. Pan American Trinidad Oil Co., 392 F.Supp. 1252, 1256 (D. Del. 1975). The same District Court continued,

[r]ather, the Court will determine the timeliness of this action, using the doctrine of laches. Laches principles require that plaintiffs delay in bringing suit be measured against the statutes of limitation for analogous state or federal causes of action. In this Circuit (ours, the Third) the analogous statute of limitation against which the timeliness of a plaintiff's unseaworthiness claim is to be measured is the three-year limitation contained in the Jones Act. (Citations omitted.)

Id at 1256.

I hold that as to the general maritime law claim of plaintiff, the Jones Act, rather than 5 V.I.C. section 31, is the analogous statute to which this Court should resort in determining whether or not this plaintiff's claim is time-barred. Additional support for this position is mustered from Ward v. Union Barge Line Corp., 443 F.2d 565 (3d Cir. 1971) and Flowers v. Savannah Machine and Foundry Co., et al., 310 F.2d 135 (5th Cir. 1962). Since the timeli-

---

[18] Had not the plaintiff's claim been brought under the umbrella of the admiralty, the affirmative defense of the statute of limitation would have been governed by Title 5 V.I.C. § 31(5)A, which sets out a two year limitation period regarding actions "for any injury to the person".

ness of the Jones Act claims is determined by a three year statute of limitation, it follows then on this analysis that our plaintiff, who was injured on June 18, 1971, and who commenced suit on June 14, 1974, may not be barred as unseasonable.

Alternatively, I approach this lateness issue weighing in the balance the Virgin Islands two year statute of limitation. I bear in mind, while so doing, that

the timeliness of plaintiff's complaint is not . . . to "be determined merely by a reference to and a mechanical application of the statute of limitations. The equities of the parties must be considered as well".

Francis v. Pan American Trinidad Oil Co., 392 F.Supp. at 1257. Accord, Hark v. Antilles Airboats, supra, and Gardner v. Panama Railroad Co., 342 U.S. 29 (1951). In Francis the Court went on to further quote from Gardner saying,

where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief, 342 U.S. at 31.

That the delay was excusable and that a defendant was not unduly prejudiced are matters on which the burden of proof rests squarely on the plaintiff. Burke v. Gateway Clipper, Inc., 441 F.2d 946 (3d Cir. 1971); Ward v. Union Barge Line Corp., 443 F.2d 565 (3d Cir. 1971). Our Court has accepted as reasonable excuse for delay in commencing suit the fact that

aviation accidents are investigated by the Government, a practice of which I will take judicial notice, and [plaintiff] may have wished to await the outcome of this inquiry.

Hark, 355 F.Supp. at 689. In the same case, lack of prejudice was spelled out by the fact that airplane torts are not of the inconspicuous variety in which witnesses disappear or suffer from failure of recollection, and further, that in

393

such torts immediate and fairly thorough investigations are undertaken and records and other matters are preserved in contemplation of trial, or perhaps other proceedings. Id. at 690. Moreover, as the Hark Court went on to point out at page 689, Courts are agreed by common consent that a relatively weak excuse will usually pass muster if the defendant is not prejudiced by the delay.[19]

In the instant case, plaintiff would excuse his delay by showing that his tardiness in filing suit was born of the fact that for quite some time he continued to believe that the injuries to his legs would heal and that he would once again resume flying for Antilles. Hubschman testified that it was only when it finally dawned on him that he would never be able to fly again that he turned to legal action. Nor was Hubschman singular in the belief that he would fly again. The evidence shows that defendant, Antilles, shared that belief. In a memorandum written as late as January 23, 1973, Captain Ronald Gilles, one of the persons in authority at Antilles, wrote to Hubschman telling him that they were then offering him a position as assistant to the Operations Manager until such time as he were able to resume flying status. Gilles went on to inform Hubschman that at such time as he could resume his flying status he would "have the opportunity to check out without loss of seniority and be restored to the pilot's list".[20]

As far as this Court can judge from the evidence, it appears that it was only when plaintiff was examined and advised by a Dr. Alan Hoekzema sometime in March of 1974, that the full realization came home to him that he would never be able to fly again. His suit followed on June 14, 1974, as we have already seen. Hubschman's excuse, if not

---

[19] See Larios v. Victory Carriers, Inc., 316 F.2d 63, 67 (2d Cir. 1963); Molnar v. Gulfcoast Transit Co., 371 F.2d 639, 642 (5th Cir. 1967); Hark v. Antilles Airboats, Inc., 355 F.Supp. 683, 689 (D.C. V.I. 1973).

[20] See Exhibit 9 for the plaintiff.

compelling, is certainly reasonable. At least it cannot be characterized as paper thin, or lame.

The plaintiff's delay was a few days short of three years. That in and of itself is not determinative insofar as length of time is concerned. A delay of five and one half years in Francis v. Pan American Trinidad Oil Company, supra, standing alone was not undue and in Claussen v. Mene Grande Oil Company, C.A., 275 F.2d 108 (3d Cir. 1960), the mere passage of nine years was not found to be so inordinate a delay that plaintiff might not maintain his suit if he could show that the defendant had not been unduly prejudiced. I turn, therefore, to examine this plaintiff's proof to see if he has satisfied that prong of the test.

I conclude that the evidence adduced on behalf of plaintiff is sufficient to show that there was no prejudice to these defendants. Both were aware of the accident; both were cognizant of the ensuing investigations. Antilles, as well as Caribbean, had knowledge of tests that had been conducted and the results of such tests. Indeed to some extent these tests had been prompted by Antilles, and that defendant had participated in at least one of them. When one considers that common to each of these two defendants was the same guiding spirit in the person of Captain Blair, it is reasonable to infer from plaintiff's proof, indirect that it may be, that these defendants suffered nothing from the delay. Moreover, despite their eleventh hour protestation on the morning of trial that plaintiff was attempting to insert a new theory of liability into the case, i.e., 402A accountability founded in defective design resulting in vapor lock and consequently double engine failure, their claim of unpreparedness was belied by the effectiveness with which they challenged the vapor lock theory. They were ready with their expert.[21]

---

[21] Moreover, defendants had much advance knowledge that there had been an agency determination that vapor lock was the contemplated cause of twin

In sum, then, I find that this plaintiff has, by competent proof, established a reasonable excuse for his delay and again by evidence, is entitled to the inference and finding that these defendants were not unduly prejudiced by his delay.

## WORKMEN'S COMPENSATION

It is contended by defendants that plaintiff having applied for and received payment under the Workmen's Compensation Law of the Virgin Islands, Chapter 11 of Title 24 of the Virgin Islands Code, is now debarred from maintaining this suit. Obviously, this contention is made on behalf of Antilles only as that defendant was Hubschman's employer. However the issue may be decided, defendant Caribbean can take small comfort, for if liable to Hubschman as a negligent third party, Hubschman is free to proceed against it under Virgin Islands law.

In part, here pertinent, Title 24 of the Virgin Islands Code provides at § 284

When an employer is insured under this chapter, the right herein established to obtain compensation shall be the only remedy against the employer.

The matter is not as simple of resolution as would appear however, because as plaintiff points out, § 251(c)(4) reads

The following employees are exempt from the coverage of this chapter: . . .

(4) Any person for whom a rule of liability for injury or death is provided by the laws of the United States.

Though not on all fours with the situation presented in the instant case, there is a particularly marked similarity between the problem here posed and that with which a court is faced when a claimant, after having received com-

---

engine failures of the G21A. This theory had been brought to the fore in discovery proceedings and thus should have come as no surprise to defendants. That was the conclusion of the court when it denied the defendants' motion for a continuance at the last minute.

pensation, either under state statutes or the Federal Longshoremen's and Harbor Workers Compensation Act, seeks recovery under the Jones Act, or on a claim of unseaworthiness. It may be instructive to make and consider the analogy. In the latter situation much depends upon the degree of the claimant's initiative as well as the administrative formality and finality involved in the award of compensation. Where there has been a minimum of initiative and formality, it seems to be universally acknowledged that mere acceptance of compensation payments will not bar a subsequent Jones Act suit. 4 A. Larson, Workmen's Compensation Law section 90.51 citing Tipton v. Socony Mobil Co., 375 U.S. 34 (1963) and Boatel, Inc. v. Delamore, 379 F.2d 850 (5th Cir. 1967). It should be made clear at the outset that there is no double recovery, for the compensation benefits are routinely credited against the Jones Act Recovery. And it seems that even where there is more than minimal initiative on the claimant's part, where he has actively filed a claim for compensation benefits, the same text writer asserts that a substantial majority of the cases hold that the claiming of compensation benefits does not, in and of itself, bar the subsequent Jones Act suit. Of course, as the claimant goes deeper into the compensation process and the formality of the hearing increases, so do the chances of his failure when he seeks a subsequent damage award. Such a claimant may find that he is barred by the doctrine of election of remedies, at least, so many courts have held. Larson, however, argues and with convincing force, that the doctrine of election is out of place in modern social insurance law.

The community has decided that injured workmen and their families shall have as a minimum the security that goes with nonfault compensation. It is not for the individual, once he is part of that system, to elect whether its protection is a good idea for him or not . . . [I]t would undermine and prejudice the operation of this

protective public program if the claimant were put in the position of risking the loss of other valuable rights, such as those under the Jones Act, by the mere fact of accepting or invoking this basic system of compensation protection. It is of the nature of compensation, as distinguished from damage actions, that it is intended to be both prompt and reliable, in order to perform its function of caring for the immediate economic and medical needs of an injured worker and his family. . . . If it turns out later that he is entitled to a more generous award under a different system, since the compensation award will be credited on the larger award, there has been no serious harm done.

4 Larson, supra.

Smith v. Service Contracting, Inc., 236 F.Supp. 492 (E. D. La. 1964) bears a striking similarity to Hubschman's case. In Smith, the award was made ex parte, the claimant not being present. In our case, Patricia Hubschman, wife of plaintiff, filed the claim for compensation for disability on behalf of her husband on July 19, 1971, while plaintiff was still hospitalized in the Veterans Administration Hospital in Puerto Rico. It would seem that in these circumstances, assuming a valid Jones Act or unseaworthiness claim for plaintiff, that his action for damages should not be barred.

■ Moving on then to the case sub judice, it is at once apparent that success or failure for plaintiff lies in the Court's construction of the phrase,

Any person for whom a rule of liability for injury or death is provided by the laws of the United States.

I hold that the language should be broadly interpreted in order to accomplish substantial justice and in the light of the liberal holdings of the courts, briefly adverted to above. It bears repeating that this claim was filed on Hubschman's behalf while he was yet hospitalized. It is important, too, that there was little, if any, formality involved in Hubschman's Workmen's Compensation hearing. The Assistant Commissioner of Labor in charge of Workmen's Compen-

sation took the witness stand. He testified that all employees of Antilles Airboats, including the pilots, were covered under the Workmen's Compensation statute. This is as it should be. But that official, Mr. Edmund L. Penn, also testified that he did not hold a formal compensation hearing, though after Hubschman had sufficiently recovered, he (Mr. Penn) informally interviewed him before he entered a final order. At no time was the determination made that Hubschman was, or was not, a seaman or, whether he was covered under any rule of liability for injuries provided by the laws of the United States. Those issues simply were not raised, far less determined. It would seem then that neither under the doctrine of election nor the doctrine of res judicata, the latter being one of the principles on which recovery has been denied, should this plaintiff be denied any recovery to which he might be entitled, if his injuries warrant recovery under the laws of the United States.

██ I do not read the phrase, "laws of the United States", to mean necessarily, and only, statutory laws. In such close juxtaposition to the phrase "rule of liability", the conclusion is readily permissible that "laws of the United States" in this context includes statutory as well as general laws of the United States. Indeed in enacting that section, the Legislature certainly had in mind that it could not legislate in areas preempted for federal sovereignty. One such area is the admiralty. It seems more harmonious to read "laws of the United States" under § 251(c)(4) in the same manner in which this Court is given its broad grant of jurisdiction under § 22 of the Revised Organic Act, as amended, that is to say

the jurisdiction of a District Court of the United States in all causes arising under the Constitution, treaties and *laws of the United States* (emphasis supplied).

■ Accordingly, I conclude that this plaintiff in the circumstances of this case falls in a category or class, exempt from the coverage of Virgin Islands Workmen's Compensation statute under Title 24 V.I.C. § 251(c)(4).

## LIMITATION OF LIABILITY

Defendant, Caribbean, urges that in the event this Court were to find that it is liable to plaintiff, it should be protected by the mantle of the Limitation of Liability Act, 46 U.S.C. § 183 et seq. and Rule E of the Rules of Admiralty of the Federal District Courts. Thus, the precise question presented is whether the aircraft 703A is a "vessel" within the purview of the statute referred to above, so as to enable Caribbean as owner of the aircraft to limit its liability in accordance with the abovementioned authority. As pointed out earlier, in the factual background for this opinion, whatever may remain of 703A is on the ocean's bottom. If plaintiff's recovery is to be limited to the value of this sunken craft, the amount to be paid over to him will be as his counsel has said "zero".

In addressing this issue, two cases are instructive and persuasive, Dollins v. Pan-American Grace Airways, 27 F.Supp. 487 (S.D. N.Y. 1939) and Noakes v. Imperial Airways, Ltd., et al., 29 F.Supp. 412 (S.D. N.Y. 1939). Although neither may be said to be recent authority, they are both well reasoned and their vital signs remain as vigorous as when they first were ushered into the world of admiralty.

Each of the two cases involved the crash of a flying boat, or seaplane, on the high seas. The aircraft in each case, like our 703A, had a hull formation in the form of a boat, was designed to float, and navigate on the surface of the water, and to take off and land on bodies of water. Each case resulted from the crash of the seaplane involved on the high seas with loss of lives. The defendant in each of

those two cases relied, as an affirmative defense, on the Limitation of Liability Act. In each case the defense failed. Caribbean's attempt here is doomed to the same fate.

Without essaying a review of the history of the limitation of liability of ship owners, it suffices to say that

> The fundamental purpose underlying the original limitation of liability statute . . . was to build up the American Merchant Marine and place it on a parity with that of other nations, . . . .

27 F.Supp. at 488.

■ The Congress intended this benefit for the owners of ships, vessels which plied the seas from port to port, their only function being that common to waterborne craft. It is certain that no type of aircraft, whatever its capability might be, was in the mind and contemplation of the Congress. For the purpose of limitation of liability, given the underlying reason for the passage of the Act, a seaplane should not be considered a vessel and I decline to do so. Accordingly, I conclude that the provisions of 46 U.S.C. § 183 et seq. and Rule E of the Rules of Admiralty of the Federal District Courts have no application to this case.

## LIABILITY UNDER 402A

Is the tort doctrine of strict liability to be applied to this suit in admiralty? Should the reach of § 402A of the Restatement (Second) of Torts be extended to "lessors"?[22]

---

[22] Restatement (Second) of Torts § 402A which reads:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

■ Plaintiff here confronts the Court with two questions of more than passing interest. Intriguing though they may be, neither will be addressed for in the view the Court takes of this case, discussion would be pointless. On the evidence before me, the attempt to establish liability, under the doctrine of strict liability as announced in § 402A of the Restatement (Second) of Torts, has been a failure. As a consequence, I must consider this case an unsuited bottom in which to launch out into such great depths. I am led to this conclusion by many reasons. However, only the ones which most strongly point me in this direction will be mentioned.

It is the claim of plaintiff that this double engine failure was caused by a vaporization in the fuel system—vapor lock. This, urges plaintiff, was due to an alleged defectively designed configuration of the aircraft fuel system. At all events, this indictment of the G21A fuel system must be seriously questioned.

■ 1. The aircraft has been in use for almost four decades. Throughout that time such a complaint has never been lodged against it, at least, not prior to Hubschman's accident. While it is true that prolonged safe use of a product does not conclusively establish lack of defect, it is certainly persuasive evidence of the non-existence of defect. Bruce, et al. v. Martin Marietta Corp., et al., 544 F.2d 442, 447 (10th Cir. 1976).

2. Apart from simply the prolonged use of the aircraft, the safety record of the goose would tend to belie so gross a defect in its design.

3. Plaintiff has not shown by the requisite standard of proof that any previous engine failure was due to a vapor lock condition.

4. Even the tests heavily relied upon by plaintiff, it must be said, are at best inconclusive.

5. The test on which plaintiff seems to place greatest

dependence showed, if anything, that long running of the aircraft engine was necessary before one even approached a state of vapor lock. There was testimony that the owner of the plane on which the Chappee test was being conducted ordered that it be stopped before they ruined his engine, for they had been running the engine a considerable length of time.

6. As against the long running of engines which the test seems to show would be necessary to have vapor lock, we are faced with the fact that the aircraft in this case had been standing idle on the ramp for quite some time before it took off on the ill-fated flight and, of course, it will be remembered that it was approximately 10–15 minutes into that flight when the engines failed. Based on the evidence, it does not seem probable that vapor lock would have occurred so soon.

7. If, as contended by plaintiff, cavitation and rough running of the engines are the precursors of vapor lock, the conclusion would seem compelled in this case that there was no vapor lock, for Hubschman's firm testimony, backed up by the statements of his passengers, was that the course of flight had been smooth and uneventful when the engines abruptly, and completely without warning, stopped. We should consider, too, that the gauges did not indicate the necessary uneven pressure.

8. Plaintiff cannot gain much solace from the fact that Pan Air Corp. saw fit to change the G21A fuel configuration. That outfit did not do so as to all of its flying equipment. Indeed, up to the date of trial, Pan Air Corp. still had at least one of its three planes with the fuel system identical to that of 703A, which is to say, as the plane was designed and manufactured. The inference to be drawn from this is that whatever might have been thought as possible shortcomings of the fuel system, Pan Air Corp. did not consider it to be all that unreasonably dangerous.

9. It cannot be seriously and reasonably argued that, at the time of the design and manufacture of the goose, it was not thought of and accepted as a properly and safely designed and built airplane. In witness of this is the fact that other aircraft built by other manufacturers after the goose used the same, or similar fuel, system configuration. To succeed here, plaintiff has relied on his "state of the art" postulate and on cases of the Noel v. United Aircraft Corp., 342 F.2d 232 (3d Cir. 1964) line.

But even as to a manufacturer under this theory of liability, he must have had notice of the defect. Moreover, under this analysis impetus is gained from the presumption that a manufacturer is abreast of his trade, thus giving rise to the permissible conclusion that such a manufacturer was on constructive notice of the defect. See generally, Note, Products Liability-Post-Sale Duty to Cure Dangerous Defects, 40 Tulane Law Review 436 (1966), a commentary on Noel v. United Aircraft Corp., supra. Would the same presumption arise in the case of a lessor in the circumstances of Caribbean? I think not. Moreover, under comment (g) to the § 402A it is stated that

[t]he rule stated in this Section applies only where the product is, at the time it leaves the seller's hands, in a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.

Comment (i) goes on to say,

The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

As the Court in Bruce v. Martin Marietta Corporation, et al., pointed out,

[w]hether concern is with one or both of the requirements, there is "general" agreement that to prove liability under § 402A, the plaintiff must show that the product was dangerous beyond the

expectation of the ordinary customer. State-of-art evidence helps to determine the expectation of the ordinary consumer. A consumer would not expect a Model T to have the safety features which are incorporated in automobiles made today. The same expectation applies to airplanes.[23]

10. Finally, in any event, the vapor lock idea, as the Court understands Exhibit 18, yet remains in the state of theoretical possibility.

It is chiefly because of the foregoing reasons that I must decline the entrancing invitation extended by plaintiff to bring this cause within the embrace of § 402A insofar as the alleged fuel defect is concerned.

It is also asserted by plaintiff that, structurally, the plane was likewise defectively designed and that it had a breaking point which unreasonably endangered the pilot and ergo the passengers. With respect to this, the first thing to be said is that much of what was adverted to above in connection with the vapor lock theory of defect applies here. Additionally, it seems to the Court that the fact that this airplane did break apart does not mean necessarily that the G21a, as a model, suffered from structural defects in its design and could not withstand an open sea landing. The evidence is ample that other aircraft of the same model made successful open sea landings. As it was in this case, trouble overcame the aircraft, not so much by reason of the landing process, but more because of untoward wave action after it had alighted on the water. Then, too, if Hubschman is to be believed, the broken stringers and the poorly bolted pilot's seat are consequences of poor maintenance rather than defective design.

Insofar as the evidence regarding the breaking point and how it could be corrected is concerned, I do not find it to be especially convincing. The attempt to show a previous shearing off of a nose section on a goose did not really suc-

[23] 544 F.2d 442, 447 (10th Cir. 1976).

ceed and even were we to agree that the plane could be made stronger by moving the breaking point forward, the wisdom of saddling the lessor of an aircraft, tested and proved as was this one, with that charge is open to question.

Lastly, it is asserted that there were no doors on the craft so that it could be made water tight and thus float and not sink. The lack of doors would be caused by the intervention of some human agency and while this shortcoming might form the basis of liability on some other theory, it would seem to be totally foreign to the doctrine of § 402A.

## 703A AS A VESSEL—ITS PILOT A SEAMAN

Undoubtedly, the consummation most devotedly wished for by this plaintiff is that his aircraft might be classified by this Court as a vessel and he, a seaman. It is understandably so, for if these conclusions are reached, his way would be made sure and his burden light. His Jones Act claim would be solidified, as would be those for maintenance and cure and unseaworthiness. Beyond that, his fortunes in this litigation would be greatly enhanced. He would benefit from the less onerous standard of negligence applicable in Jones Act cases. The quantum of negligence he would have to establish is less. Lighter also would be his impost of making out proximate causation on his Jones Act cause, and he would enjoy less strenuous proof than that required not only in regular civil actions but in general admiralty actions for negligence as well. See Johnson v. United States, 333 U.S. 46 (1948). Under the Johnson teaching, plaintiff would make out a prima facie case simply on a showing that he was injured and that his injury could have been caused by the negligence of the ship owner. Even going beyond all this, plaintiff, on his unseaworthiness claim, could claim the benefit from the fact

that the cause of action has been developed by the Supreme Court into a "species of liability without fault". See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 94 (1946). There, Mr. Chief Justice Sterling stated that a shipowner has a duty to furnish a seaworthy ship, a duty which is absolute, is not predicated on negligence and is not satisfied by the exercise of due diligence. In other words,

It is a form of absolute duty owed to all within the range of its humanitarian policy.

Id. at 95.

It bears mention that sustained research has not uncovered a single case holding an aircraft to be a vessel and the pilot of an aircraft to be a seaman. On the other hand, it must be admitted also that no case has been laid open saying that an aircraft is not a vessel and the pilot not a seaman. Against this background, we will examine the circumstances pertinent to this case.

With precious little discussion, plaintiff in his brief (p. 20) expresses the firm belief,

that plaintiff was so engaged [performing a navigational function on a vessel engaged in traditional maritime activity] when operating a seaplane.

From that springboard, plaintiff makes the leap to a conclusion which he attributes to Judge Wisdom, that any structure capable of floating is a vessel. With little more, plaintiff goes on to assume the conclusion that the seaplane is a vessel within the meaning of case law and thereafter, given those premises, ends up with the finding that this plaintiff is a seaman within the Jones Act. Leaning towards plaintiff on the positive side, several general principles may be quickly observed:

1. That the Jones Act is to be liberally construed for policy reasons, to provide for injured persons.

2. Whether plaintiff is or is not a seaman is a question for the trier of fact, to be determined from the particular circumstances of each case and, indeed, Mach v. Pennsylvania Railroad Co., 317 F.2d 761 (3d Cir. 1963) so holds.

3. As observed above, no case has held that a seaplane pilot is not a seaman.

4. Seaplane pilots perform functions qualitatively different from pilots and crews of other aircrafts, at least on certain portions of each voyage.

5. Hubschman had to "pilot" the seaplane after it was afloat on the water and in so doing he may certainly be said to have been performing functions traditionally performed by sea captains.

6. Hubschman undoubtedly was contributing to the welfare and operation of the craft and to the function or mission in which it was engaged (see 4 A. Larson Workmen's Compensation § 90.21 at 296–9F (1976)).

7. Once the seaplane broke apart, Hubschman faced the same dangers as any seaman left in the open sea after his ship has foundered.

As to whether 703A may be constituted a vessel, there are again several positive factors which might be said to lend support to such a conclusion. Once more we find that the determination is left in the lap of the fact finder. Also, it can be said that the term "vessel" should be, and has been, liberally construed to accomplish the remedial purposes of the doctrine of unseaworthiness. Furthermore, in this case, unlike several others in which certain structures were held not to be vessels, for example, oil rigs, floating construction platforms, and the like, the goose was capable of floating on water and also of moving in controlled directions on the water under motor power. Indeed Hubschman was about to do precisely these things when this mishap occurred. Once again, we mention that

the seaplane was performing a function traditionally that of ships, i.e., carrying mail, freight, and passengers across navigable waters. It should be noted too, that perhaps the foremost authorities on admiralty law, Professors Gilmore and Black, have stated that,

the term "vessel" is applied to floating structures capable of transporting something over the water.

Gilmore and Black, Law of Admiralty, § 1-11 at 33 (2d ed. 1975).

Finally, favoring plaintiff is the definition of "vessel" found in 1 U.S.C. § 3,

[e]very description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

On the negative side, looking first to various statutes, there seems to be a rather clear indication that airplanes, even it seems seaplanes, hardly fit the description of a "vessel". For a starter, the very Jones Act, the benefit of which plaintiff would claim, defines that word at 46 U.S.C. § 801 to include,

all water craft and other artificial contrivances of whatever description and at whatever stage of construction, whether on the stocks or launched, which are used or are capable of being or are intended to be used as a means of transportation on water.

Quaere whether a goose is used, or is capable of being used, or is intended to be used as a means of transportation on water?

Another statute § 1509 (a) of Title 49 U.S.C. incorporates a provision of its predecessor, the Air Commerce Act of 1926, to the effect that the navigation and shipping laws of the United States, including any definition of vessels, are not to be construed to apply to seaplanes or other aircraft or to the navigation of vessels in relation to seaplanes or aircraft. And 33 U.S.C. §§ 1051–94, the Interna-

tional Regulations for Preventing Collisions at Sea (and this act applies to seaplanes) reads at § 1061(a)

Sections 1061 to 1094 of this title shall be followed by all vessels and seaplanes upon the high seas and in all waters connected therewith navigable by seagoing vessels, except as provided in section 1092 of this title. Where, as a result of their special construction, it is not possible for seaplanes to comply fully with the provisions of sections 1061 to 1094 of this title specifying the carrying of lights and shapes, these provisions shall be followed as closely as circumstances permit.

When one looks at 33 U.S.C. § 1601(c), to which attention is directed it will be found that in § 1061(c)(i)

the word "vessel" includes every description of water craft, other than a seaplane on the water, used or capable of being used as a means of transportation on water.

§ 1061(c)(ii) defines seaplane to include

a flying boat and any other aircraft designed to manoeuvre on the water.

Clearly, § 1061(c) in all its subsections recognizes a similarity between vessels and seaplanes and, in several respects, treats them alike, but equally clear is the recognition that a difference exists. In § 1061(c) the reference is to "vessel or seaplane on the water".

As far as the decided cases are concerned, no clear and certain answer can be gleaned from a scrutiny of them. Professor Moore in his treatise on Federal Practice cites three cases supporting the negative of plaintiff's proposition. Marino v. Trawler Emil C. Inc., 3 Aviation Law Reports 17, 933 (Mass. Sup. Jud. Ct. 1966); Chance v. United States, 266 F.2d 874 (5th Cir. 1959); and King v. Pan American World Airways, 270 F.2d 355 (9th Cir. 1959), cert. denied 362 U.S. 928 (1960). See 7A J. Moore, Federal Practice ¶ .220[1] at 2503.

In the last of the three cited cases, the one most in point, an in flight supervisor of pursers, stewards and steward-

esses, was killed in an airplane crash on the high seas while in the scope of his employment. It was the holding of the Ninth Circuit that his Administratrix could not bring an action under the Death on the High Seas Act and that she was limited to recovery under the California Workmen's Compensation Statute. In short, the Court concluded that, "decedent's employment was not maritime", 270 F.2d at 364.

Yet in contexts not involving aircrafts, the Supreme Court seemed to lean to the idea that any worker whose duties had the slightest contact with a structure on navigable waters was entitled to a verdict of seaman's status, apparently, regardless of whether or not the structure was a vessel or even capable of navigating. See Senko v. Lacrosse Dredging Corp., 352 U.S. 370 (1957), Grimes v. Raymond Concrete Pile Co., 356 U.S. 252 (1958) and Butler v. Whiteman, 356 U.S. 271 (1958).

In what has to be considered as a turning away from that tendency, however, the high court in West v. United States, 361 U.S. 118 (1959) and Roper v. United States, 368 U.S. 20 (1961) held that two plaintiffs were not entitled to the warranty of unseaworthiness because the ships on which they were working had been withdrawn from navigation. Accordingly, it has been said that this worked a sub silentio overruling of the Senko, Grimes and Butler cases cited above.[24]

The results have been equally unclear in the lower Federal Courts. In Mroz v. Dravo Corp., 429 F.2d 1156 (3d Cir. 1970), the plaintiff was held to be a seaman on a vessel, even though the ship was literally and figuratively, at the time of the accident, tied up. Tied up at the dock and tied up by a strike.

Barrios v. Louisiana Construction Materials Co., 465

---

[24] Gilmore and Black, Law of Admiralty, § 6-21 at 333 (2d Ed. 1975).

F.2d 1157 (5th Cir. 1972) reached a like result. In this one, plaintiff, an oiler, was held to be a seaman although he was injured while helping to load a "drag line" on a barge for transportation to a work site. On the other hand, Cook v. Belden Concrete Products, Inc., 472 F.2d 999 (5th Cir. 1973) held plaintiff was not a seaman though he was injured on a floating platform moored on navigable waters.

The cases dealing with accidents involving seaplanes are equally unhelpful for they indicate no clear trend. In The Crawford Bros. No. 2, 215 Fed. 269 (W.D. Wash. 1941) the court stated that such an aircraft was,

neither of the land nor sea, and, not being of the sea or restricted in [its] activities to navigable water, [it is] not maritime.

Id. at 271.

But in Reinhardt v. Newport Flying Service Corp., 133 Northeastern 371 (N.Y. 1921), famous if for no other reason than that it is so oft cited and Judge Cardoza's dictum so frequently quoted (cited by both sides in this case to prove opposing views), Judge Cardoza opined that an aircraft such as the one with which we are concerned,

is, indeed, two things—a seaplane and an aeroplane. To the extent that it is the latter, it is not a vessel, for the medium through which it travels is the air . . . [t]o the extent it is the former, it *is* a vessel, for the medium through which it travels is the water. . . . It is true that the primary function is then movement in the air, and that the function of movement in the water is auxiliary and secondary. That is, indeed, a reason why the jurisdiction of the admiralty should be excluded when the activities proper to the primary function are occasion of the mischief. It is no reason for the exclusion of jurisdiction when the mischief is traceable to the function that is auxiliary and secondary.

Id. at 372.

Six years later a Missouri Court thought otherwise, however. In Wendorff v. Missouri, 1 Southwestern 2d 99 (Mo. 1927), the Supreme Court of that state held that airplanes were not vessels. Wendorff was an action involving an at-

tempt to recover on a life insurance policy which excluded from its coverage death occurring as a result of an airplane accident. The flight of a seaplane from Florida to the Bahamas was involved. That seaplane, as did ours, made a forced landing at sea. Like ours, too, it was subsequently capsized by waves. The insured drowned. The Court concluded that although there are sound reasons for subjecting a floating seaplane to certain maritime rules, it did not necessarily follow that such a craft on the water always wholly lost its character as a flying machine. That court considered the primary function of the seaplane to be to navigate in the air and expressed the opinion that a seaplane is a device for aerial navigation. It declined to hold it to be otherwise simply because it was forced down on water at the time of the accident. Id. at 103.

Almost ten years later in United States v. Northwest Air Service, Inc., 80 F.2d 804 (9th Cir. 1935), the Court of Appeals found that

a seaplane, while afloat on navigable waters of the United States, may be a vessel within the admiralty jurisdiction. . . . [I]t is not such a vessel while stored in a hangar, on dry land, with its engine in a shop, also on dry land, undergoing repairs, nor does the making of such repairs create a maritime lien.

Id. at 805.
One can hardly quarrel with that conclusion.

Then in Dollins v. Pan American Grace Airways, Inc., supra and Noakes v. Imperial Airways, Ltd., supra, seaplanes were held to be not vessels for purposes of the Limitation of Liability Act as we have mentioned above. Further, United States v. Peoples, 50 F.Supp. 462 (N.D. Calif. 1943), is cited for the proposition that a stowaway on a naval air transport could not be prosecuted under the statute defining the criminal offense of stowaway on a vessel. Also, United States v. Cordova, 89 F.Supp. 298 (E.D. N.Y. 1950), held that an offense committed on an airplane fly-

ing over the ocean could not form the basis for a prosecution under the Crime on the High Seas Act. It was there said that Reinhardt had been legislated out of existence. Id. at 302.

Finally, swinging the pendulum the other way, Lambros Seaplane Base v. The Batory, 215 F.2d 228 (2d Cir. 1954) regarded a seaplane as a vessel within the admiralty jurisdiction for purposes of salvage.

 I cannot but conclude that the aircraft in this case is not to be considered a vessel nor its pilot a seaman. Admittedly, many positive factors have been acknowledged in this opinion which would support the urgings of this plaintiff, but those serve only to move the Court forcefully to the finding that the admiralty jurisdiction attached in this case in the sphere of its general maritime law. But those principles cannot serve the dual purpose of also constituting this aircraft a vessel and ordaining plaintiff a seaman. Since I conclude that 703A cannot be considered a vessel, it must necessarily follow that plaintiff is not to be considered a seaman. Logic dictates that as to his Jones Act, unseaworthiness, and maintenance and cure claims, it is necessary that there be a vessel. There being no vessel plaintiff cannot be considered a seaman. Granted plaintiff was not flying through the air but was on the water at the time of the misadventure. He was in the process of landing on the water and it seems to this Court that just as in Hark the thought was expressed that there is a point in take off when even though out of the water, the plane has not fully been brought under control as an aircraft, and thus is subject to maritime jurisdiction, so it would appear that for some time after making contact with the water in the landing process and until the aircraft is fully under control as a seaborne structure, it cannot be said that the plane is navigating in the water. This accident was so closely connected with the landing process that although I

have found more than enough maritime nexus to satisfy any standard set by Executive Jet, the plane was not sufficiently proceeding as a watercraft to earn classification as a vessel, and its pilot as a seaman. Were the situation such that the landing had been fully effected and, for the sake of argument, the pilot had achieved a restart of the engines and was guiding the craft through water, we could say certainly, it was for all purposes, a vessel, and the pilot a seaman. Or even without a restart of the engines, if the plane were just being guided and afloat, even though adrift, one could reasonably place reliance on the Cardoza dictum of the Reinhardt case, and reach the conclusion that the structure was a vessel. But neither of those factual situations obtain here and in view of what seems the better reasoned of the authorities, I come to the conclusion that this aircraft is not, for the purposes of this case, to be considered a vessel and the plaintiff a seaman. Already we have a regular seaman, and a Sieracki seaman. It would not be in aid of "The Admiralty Adrift" to add another classification, a "Hubschman" seaman.

I have already found above that this aircraft was not a vessel for purposes of limitations of liability, relying on Dollins and Noakes. The turnabout would be too much for me, to call the craft a vessel for these purposes and a non-vessel for limitation of liability purposes. Such inconsistency I must try to avoid at all costs.

To sum up then, I must turn my back on the tantalization of plaintiff, to be a famous first and to declare this aircraft a vessel and its pilot seaman.

It, of course, follows that the claim under the Jones Act, the one for unseaworthiness and the other for maintenance and cure, must fall by the wayside.[25]

---

[25] It should be understood that the issue of the applicability of the Jones Act to the Virgin Islands has not been decided, one way or the other.

Shorn of his Jones Act, unseaworthiness, maintenance and cure, and § 402A protestations of defendants' liability, plaintiff is reduced in his quest for redress to his claim of negligence under general maritime law. In his complaint Hubschman has pleaded innumerable specific acts of negligence on the part of defendants. To all of that he added a general allegation of negligence. The latter might prove to be the avenue of saving grace.

I have already dealt with the failure of proof regarding the vapor lock theory. Nothing is to be gained by a repetition of what has been previously said.[26]

■ ■ The litany of complaints of negligence is quite long. Each has been separately examined in an effort to relate proof to allegation. In each case the relationship could not be established. The evidence simply fails to establish any of the alleged acts of negligence by the requisite standard for civil cases. Still I do not consider this to be fatal to the plaintiff's claim. I consider him to be protected by his general allegation of negligence and the more I consider all aspects of this case, the more my mind turns to an 1863 incident in which a barrel of flour rolled out of the window of a defendant's warehouse and fell on a passing pedestrian. There in Byrne v. Boadle, 2 H & C 722, 159 Eng. Rep. 299 (1863), Baron Pollock is said to have quite casually dropped the phrase res ipsa loquitur "the thing speaks for itself". That is the conclusion I reach with respect to Antilles' liability.

As provided by § 4 of Title 1 of the V.I. Code

---

[26] It might be mentioned, however, that militating against the vapor lock theory is the testimony of Hubschman himself that he had scanned the instrument panel continuously during the flight and had noted nothing untoward. Of course, at trial he was at great pains attempting to show that the pressure differential, the existence of which was a must for there to have been a vapor lock, could have taken place and not been registered on the gauges. That, however, invites the Court too deeply into the realm of speculation.

The rules of the common law, as expressed in the restatement of the law approved by the American Law Institute, and to the extent not so expressed, as generally understood and applied in the United States, shall be the rules of decision in the Courts of the Virgin Islands. . . .

The Supreme Court of Pennsylvania in recent years had occasion to comment on the American Law Institute's formulation of the doctrine of res ipsa loquitur in § 328D of the Restatement (Second) of Torts. That Court had this to say:[27]

Careful review and considered reflection convince us that the evidentiary rule enunciated in the Restatement is a far more realistic, logical, and orderly approach to circumstantial proof of negligence than the multiple doctrines formerly employed in Pennsylvania.

It is fortunate that we have such highly recommended authority on which to rely.
Under § 328D

(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff.

(2) It is the function of the Court to determine whether the inference may reasonably be drawn by the jury, or whether it must necessarily be drawn.

(3) It is the function of the jury to determine whether the inference is to be drawn in any case where different conclusions may reasonably be reached.

On my examination of the evidence in this case, each of the three requirements has been amply met.

---

[27] Gilbert v. Korvette, Inc. et al., 327 A.2d 94, 100 (Pa. 1974).

■■ It may immediately be said that absent negligence, the twin engine failure of 703A would not have occurred. The old notion that res ipsa loquitur is inapplicable to airplane accidents, Morrison v. LeTourneau Co., 138 F.2d 339 (5 Cir. 1943), is happily in the distant past. As the Fifth Circuit aptly noted,

[a] situation to which the doctrine was not applicable a half century ago because of insufficient experience or lack of technical knowledge, might today fall within the scope of the rule, depending upon what experience has shown.

Williams v. United States, 218 F.2d 473, 476 (5 Cir. 1955). No longer can air travel be deemed so inherently risky that people in this day and age can be said to generally believe that aviation accidents can and do happen without human, or mechanical, shortcoming. Said the Court in Higginbotham v. Mobil Oil Corp., 545 F.2d 422, 429 (5 Cir. 1977)

We think experience now teaches otherwise. Major improvements in design and manufacturing technology, in pilot training, and in ground control, communications, and navigational aids, among other things, have combined to give air travel an estimable safety record.

And it is to be noted that in his treatise on the law of torts, the text writer, Prosser, confidently asserts that the later line of cases support the application of res ipsa loquitur to airplane crashes. W. Prosser, Law of Torts, § 39 at 220–21 (3d Edition 1964).

To mention the enviable safety record of today's aircraft is to underscore an important point here. Defendants themselves both highly laud the goose as a safe airplane. They point to its almost forty years of safe operation. More than one of the witnesses who testified in this case, in each case an airplane pilot of superlative qualifications, have praised the goose as a sound airplane. Vapor lock, the theory suggested by plaintiff, has not been a part of the experience of this airplane. Irving L. Jones, president of

the airline which sold 703A to Caribbean, described it as "immaculate" upon delivery; "factory new or better"; and "no better goose" in the United States.

The record shows that there have been twin engine failures prior to, and after, June 18, 1971, the day of the Hubschman misfortune. Insofar as the causes of those occurrences have been identified, some negligence was the key. In one case, the failure was thought to be the result of some foreign matter which had found its way into the fuel system. In another, it seems to have been determined that a maintenance valve in the fuel line was inadvertently left open after the airplane had been serviced. In yet another case, as counsel for Caribbean put it, the captain "mundanely ran out of gas" (brief of Caribbean Flying Boats, Inc., footnote 5, page 9). Those instances were mentioned not at all to say what precise act of negligence caused the engine failure in the instant case, but rather to bolster the hypothesis that a twin engine failure in a plane with the demonstrated record of the goose simply does not occur in the absence of negligence. Indeed, one defendant directed the Court's attention to an exhibit, part of the deposition of Captain Sorren, wherein it was stated by the Captain that he had been advised that a mechanic (mentioned by name in the deposition) had installed a valve on 703A backwards, prior to its ill-fated flight. Again, mention is not made of this to urge that this is what happened but rather to emphasize the point that the inference of negligence is highly warranted in the circumstances. Even the defendant, Caribbean, in its brief in various sections, strongly suggests inadequate maintenance on the part of defendant, Antilles. To a defense witness, Loth, is attributed the statement that the fuel filter valve of this aircraft required careful maintenance (brief of plaintiff at page 44). And another defense witness, Slinn, concludes in effect, that with a fuel system as sound as that of the

goose, the twin engine failure would be more probably than not attributable to negligence. The witness opined that perhaps a loose fitting in the cockpit fuel line brought about this disaster. In Mr. Slinn's opinion, the fuel line would be adequately tightened only with the use of a wrench, whereas he supposes in this case it was tightened only "finger tight". With this vast potential for negligence, the inference that there was negligence and that res ipsa loquitur applies, is almost compelled. This case is almost that cited as illustration number 3 to the comments to Clause (a) of § 328D.[28]

It is patent in this case that "other responsible causes, including the conduct of plaintiff and third persons, are sufficiently eliminated by the evidence". This formulation eschews the requirement which obtains in some jurisdictions that the agency must have been under the exclusive control of the defendant. But even this extreme element is satisfied. Defendant, Antilles, through its employees, agents and officers, was solely responsible for the proper operating condition of the airplane. The conduct of no other person or agency is involved. It might be suggested that the plaintiff's conduct is not eliminated, since defendant bears down heavily on him, asserting that he made an improper ("suicidal") landing. Even so, that intervention came after the twin engine failure and in no way contributed to it. Moreover, I do not find the landing to have been improperly executed. My finding is to the contrary. Granted, there was some confusion and embarrassment when the plaintiff came to indicate on a map the direction in which he had landed the plane. What he did, in fact, in-

---

[28] In that illustration, "A is a passenger in the airplane of B company, a common carrier. In good flying weather the airplane disappears and no trace of it is ever found. There is no other evidence. Various explanations are possible, including mechanical failure which could not have been prevented by reasonable care, and bombs planted on the plane. It may, however, be inferred by the jury that the most probable explanation is some negligence on the part of B company."

420

dicate did not squarely coincide with the direction claimed by Captains Blair and Schell to be the proper one. But this is a problem encountered by the Court day in and day out. Even persons of whom better is expected cannot graphically illustrate on a chart what they articulate verbally. In any event, the fact remains that it was Hubschman who landed the plane. I see no reason to challenge his repeated statement that he landed parallel to the swells which all admitted would be acceptable. Captain Blair now seeks to fault the landing executed by Hubschman. Such, however, was not his view on June 22, 1971, when, in a confidential memo to all pilots of Antilles, he stated:

Captain Hubschman did a highly commendable job, under those difficult circumstances, and we have only the highest praise for his airmanship and for his execution of emergency procedures prior to and subsequent to the ditching.

By that time, I take it, the Captain knew that the plane had broken in two and ended up at the bottom of the ocean. Surely he knew what the weather conditions and wave actions were at the time of the landing. The doubts he now claims would, by that time, have been implanted in his mind, and with any questions raised as to the propriety of the landing, such lavish praise would have not been bestowed, even if said to cheer a seriously ill confrere.

 The position is advanced that the airplane ended up in the water, upside down, and that this, if a fact, is indicative of an improper landing. Defendants point to statements of three of the passengers, given to persons investigating the accident shortly thereafter. Hubschman, on the witness stand, vehemently denied that the plane was ever on its back. For several reasons I accept plaintiff's version as the more likely of the two. For one thing, Hubschman, appeared before me and credibly testified though he was very much in the crucible of cross examination, whereas the statement of the passengers were un-

sworn and untested. For another, Hubschman, it is clear, was quite conscious, and very much the Captain in command while in the water. He wisely supervised, and appropriately directed his passengers in the best interest of the safety of the group. He commanded the two passengers who chose to take refuge on the plane to get into the water and keep away from the plane as it would sink, as it did, to no avail. He gave assistance to the passenger who, like himself, was without a life preserver. Hubschman stated that he swam to the plane and tried to tear off one of the floats to use as a floatation device. He could hardly have made this attempt, given his broken legs, with the plane on its back. Then, too, it seems more likely that if passengers climbed onto the wing of the plane, to get out of the water, the goose was more likely right side up.

To be weighed against the foregoing are the statements of the passengers. As I read them, the confused state of mind of those persons becomes quite evident. The one who says she was strapped to her seat hanging upside down also says the plane went down tail first. The plane went down nose first. Another who says the flying boat was on its back thinks that at first only one engine had ceased to operate. This was not the case. This same passenger recalls that everyone had life preservers. Clearly untrue.

On balance, and in view of the Captain's composure throughout this ordeal, despite his injuries, I choose to believe him.

The two prongs, therefore, of the Restatement's three prong test, have been successfully encountered.

As to the third remaining tine, it goes without saying that the "indicated negligence is within the scope of the defendant's duty to the plaintiff". As to this, no more need be said.

Several questions come to mind and each is answered favorably to plaintiff's claim. Is the doctrine of res ipsa

loquitur supportable in a claim under general maritime law? So holds Higginbotham v. Mobil Oil Corp., supra. And the same answer is strongly suggested in Lindsey v. MacDonald Douglas Aircraft Corp., 460 F.2d 631 (8 Cir. 1972).

Must res ipsa be specifically pleaded or will an allegation of general negligence suffice? What seems to me to be the better and apparently the generally accepted view is that res ipsa need not be specifically pleaded and that the situation will be saved by a general allegation of negligence. Fassbinder v. Pennsylvania RR Co., 322 F.2d 859 (3 Cir. 1963); Dugas v. Kansas City Southern Railway Line, 473 F.2d 821 (5 Cir. 1973); Mobile Chemical Company v. Bell, 517 S.W.2d 245 (Tex. 1974). See also annot. 2 A.L.R.3d 1335 (1955).

Equally without consequence is the fact that plaintiff has pleaded specific acts of negligence and indeed, undertook at trial to prove to some extent, the pleaded acts or omissions. Here again, the generally accepted view favors plaintiff. He does not lose his right to rely on a res ipsa inference solely because he has pleaded and established specific acts of negligence. Mobile Chemical Co. v. Bell, supra, at 254. Wilkinson v. Vesey, 295 A.2d 676, 692 (R.I. 1972).

■■■ It might be argued too, that plaintiff cannot maintain a suit for negligence against his employer under the general maritime law. Such a contention would be grounded on the case of The Osceola, 189 U.S. 158 (1903), claimed universally as authority for that doctrine. The believed impediment is the fellow servant rule. Today, however, the holding of The Osceola it is said

should be restricted to instances in which a member of the crew of the vessel is injured by the negligence of another crew member of the same ship.

Higginbotham v. Mobil Oil Corp., 357 F.Supp. 1164, 1176

423

(La. 1973). See also Linehan v. U.S. Lines, Inc., 417 F.Supp. 678, 688–89, 694 (D.C. Del. 1976).

We have already refused to name 703A a vessel and Hubschman, a seaman. Even had we done so, however, it would be completely beyond question that the maintenance personnel on the ground would not have been crew members and thus, barring fellow servants of Hubschman. My careful examination of the facts of this case vis-a-vis the doctrine of res ipsa loquitur convinces me that it may be properly applied and on that basis then, the liability of the defendant, Antilles, to plaintiff rests firmly established.

## LIABILITY—CARIBBEAN

■ Reduced to its present posture, the liability in this case of defendant, Caribbean, is controlled wholly and solely by § 407 of the Restatement of Torts (Second).

A lessor who leases a chattel for the use of others, knowing or having reason to know that it is or is likely to be dangerous for the purpose for which it is to be used, is subject to liability as a supplier of the chattel.

For a more detailed examination of that liability we are referred to §§ 388–390.

The liability, it appears, depends upon the supplying of a dangerous chattel with knowledge, actual or constructive, of the danger. Culpability stems from a duty to warn, that is to say the known dangers must be communicated to the person supplied with the chattel. All of this suggests that the duty to warn relates to dangers known to the supplier. In other words, those potentials for harm inherent in the chattel supplied, which are peculiarly within the knowledge of the lessor. For me the clear implication is that the knowledge of lessor must be such as he possessed at the time he supplied the chattel. Absent such knowledge, liability does not *impinge*. This view is supported by competent authority. 8 Am.Jur.2d Bailments § 154 at 1047. The

gist of that section is that if defects, or dangerous conditions, arise subsequent to the letting, and independent of the condition of the chattel at the time it was leased, the lessor would be liable only if the responsibility of repair was his and he had knowledge of the defect. In accord, Skelley Oil v. Daring, 375 P.2d 917, 920 (Oklahoma 1962); Petersen v. Nevada Motor Rentals, Inc., 470 P.2d 905, 908 (Colo. 1970), and see also Evans v. Goldfine Rental Services, 361 A.2d 643 (Pa. 1976). In the latter case the Court wrote,

> Lessors and owners of motor vehicles may be liable for personal injuries suffered by third parties because of defects in the vehicles. However, their duty is limited to defects known, or discoverable, by reliable inspection.

Id. at 649.

 Relating foregoing to the facts of this case, it is clear from the terms of the lease that the duty of maintenance rested squarely on the shoulders of Antilles. But beyond that, the evidence fails to disclose any defects, or dangerous conditions in 703A existing at the time of the letting which were known to Caribbean, or the existence of which they had reason to know. True the evidence tells us that in June of 1971 there were broken members and an improperly fastened pilot's seat which might be deemed dangerous conditions. Also we are told that the breaking point on the plane was a structural defect. There has been no showing, however, that the breaking point is a generally recognized defect so that knowledge of it could be attributed to Caribbean. Nor does the evidence unerringly point to even constructive knowledge on the part of Caribbean that the poor condition of certain structural members of the plane created a dangerous condition. We have testimony that shortly before the accident, the latter condition was made known to the chief executive officer of Caribbean, but timewise that falls short of the requirement.

Stretching it one might infer that if those conditions existed in June 1971, they likely existed in April of 1970 when the plane was leased. Without a firmer factual basis, however, such an inference would be guesswork and I will not indulge in it. It is not as though the situation were comparable say, to the lease of a motor vehicle on which the brakes failed to operate shortly after the lessee took possession. In such event, the inference of defective condition at delivery might be warranted as was held to be the case in Benton v. Sloss, 240 P.2d 575 (Cal. 1952).

■■■ Nor am I inclined to follow the sparse line of authority which implies a warranty, or representation, of fitness[29] for the duration of the lease, again because it was expected that careful maintenance would be performed by the lessee. This case simply cannot be fitted into those special circumstances. Consequently, I conclude that liability of defendant, Caribbean, has not been established and the case against that defendant necessarily falls.

## LOSS OF CONSORTIUM

■■■ Approached from each of two separate and distinct angles, I unhesitatingly reach the conclusion that plaintiff, Patricia Hubschman, may recover for loss of consortium. Since, as we found that the Admiralty Court in the area of laches borrows from the law side and looks to a comparable statute of limitations for assistance, so I find to be the case with respect to loss of consortium.

In Igneri v. Cie de Transports Oceaniques, 323 F.2d 257 (2d Cir. 1963), the wife of an injured longshoreman was denied damages for loss of consortium resulting from injuries accidentally caused by the vessel owner's negligence or by unseaworthiness of the vessel. In affirming the Dis-

[29] See Cintron v. Hertz Truck Leasing and Rental Service, 212 A.2d 769 (N.J. 1965).

trict Court's dismissal of the wife's claim however, Judge Friendly on the appellant level remarked,

Although New York's denial of a claim by a wife for loss of consortium is thus in no way decisive, it does not follow that reference to the common law generally is without relevance. Maritime law draws on many sources; when there are no clear precedents in the law of the sea, admiralty judges often look to the law prevailing on the land. (Citation omitted.) At least this much is true. If the common law recognized a wife's claim for loss of consortium, uniformly or nearly so, a United States admiralty court would approach the problem here by asking itself why it should not likewise do so; if the common law denied such a claim, uniformly or nearly so, the inquiry would be whether there was sufficient reason for an admiralty court's nevertheless recognizing one. (Citation omitted.)

Id. at 259–60.

In 1963 when Igneri was announced, but eleven states permitted recovery for loss of consortium. Today no less than thirty-six states do and this district is now committed to that view. See Benjamin et al. v. Cleburne Truck & Body Sales, Inc. et al., 13 V.I. 545, 424 F.Supp. 1294 (D.C.V.I. 1976), affd. 13 V.I. 689, 566 F.2d 1168 (3rd Cir. 1977), and Pascal et al. v. Charley's Trucking Service, Inc. et al., 13 V.I. 555, 436 F.Supp. 455 (D.C.V.I. 1977). If then guidance were sought in the common law as interpreted in the Virgin Islands, it would be found that a wife could maintain an action for loss of consortium.

The foregoing apart, I am of the opinion that Patricia Hubschman's claim is maintainable under the general maritime laws of the United States. It is true that the case on which principal reliance is placed was an action for wrongful death. Sea Land Services, Inc. v. Gaudet, 414 U.S. 573 (1974). Also, I am mindful of the fact that in the Fifth Circuit an action for loss of consortium was deemed maintainable where the suit was one for wrongful death in a

maritime tort. Skidmore et al. v. Grueninger et al., 506 F.2d 716 (5th Cir. 1975). Relying on Gaudet, but on the same authority was disallowed in Christofferson v. Halliburton Co., 534 F.2d 1147 (5th Cir. 1976), where the wife brought suit for loss of consortium, her husband having been injured, but not fatally.

The court was cited by plaintiff to New York & Long Branch Steamboat Co. v. Johnson, 195 F. 740 (3d Cir. 1912) as authority for the proposition that a wife was permitted to recover for loss of consortium under maritime law. In that case, however, it was the husband who sought damages for loss of consortium in connection with injuries to his wife. I take encouragement, nonetheless, from a question asked by the court in New York & Long Branch Steamboat Co.

The tort, then, being wholly maritime, why does not such tort constitute a maritime cause of action to everyone who was injured thereby?

Id. at 741.

That question was elicited by the contention that the injured wife might maintain the maritime cause of action but that the husband could not for loss of consortium.

A memorandum by Judge Lasker of the District Court for the Southern District of New York questions the current vitality of Igneri. Giglio v. Farrell Lines, Inc., 424 F.Supp. 927 (S.D. N.Y. 1977).

In his memorandum Judge Lasker denied defendant's motion to dismiss the plaintiff wife's cause of action for loss of consortium under Federal maritime law. Gaudet was relied on heavily in that case as it will be in this. The language of Gaudet, as I read it, is sufficiently broad to support a ruling that Mrs. Hubschman may maintain an action for loss of consortium under general maritime law. In Gaudet the court said

The decedent's dependents may recover damages for their support, services, and society.

414 U.S. at 584.

Further, the court defines society to include that

broad range of mutual benefits each family member received . . . including love, affection, care, attention, companionship, comfort, and protection.

Id. at 585.

This comes so close to spelling out consortium that to insist on a distinction as has been well said would be to split hairs. In concluding as I do that plaintiff, Patricia Hubschman, may maintain her action for loss of consortium, I do no more than

shape the remedy to comport with the humanitarian policy of the maritime law to show "special solicitude" for those who are injured within its jurisdiction.

Id. at 588.

On all the foregoing then, judgment will be entered dismissing the complaint against defendant, Caribbean Flying Boats, Inc. Judgment will be entered against defendant, Antilles Airboats, Inc. in favor of both plaintiffs.